UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60011-CR-ROSENBAUM/Snow

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ANDRE D. BARBARY, et al.,

        Defendants.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Defendant **Willie J. Hartfield's** Motion to Suppress Physical Evidence and Confessions, Admissions or Statements (DE 223), which was referred to United States Magistrate Judge, Lurana S. Snow, for Report and Recommendation.

Defendant **Willie J. Hartfield** is charged by Indictment with conspiracy to distribute and to possess with intent to distribute oxycodone and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count One) and conspiracy to use telephone and cellular telephone facilities to commit drug felonies, in violation of 21 U.S.C. §§ 846 and 843(b) (Count Two). The Defendant seeks to suppress approximately 1300 grams and/or approximately 10,000 percocet and oxycodone pills; any and all paperwork or documentation regarding receipts or reservations for train travel; any and all paperwork or documentation regarding receipts or reservations for hotel rooms in the Boston area; any and all information stored on a cellular phone carried by Defendant Hartfield, and any and all incriminating statements, admissions or confessions, all obtained at the time of his arrest on September 24, 2010. The Defendant challenges the initial stop, the taking of his statement and the search of his luggage which occurred on that date.

The motion is fully briefed and an evidentiary hearing was conducted on July 18, 2012. Therefore, the motion is ripe for consideration.

## I. EVIDENCE PRESENTED

The sole witness at the hearing was DEA Special Agent David O'Neill, who testified that he has been with DEA for the past 16 years and is involved with domestic drug interdiction. Agent O'Neill explained that Boston's South Station is the end of the line for northbound AMTRAK trains and a place where drugs commonly are interdicted. He stated that on September 23, 2010, he was contacted by Albuquerque DEA Special Agent Kevin Small, who advised him that Defendant Hartfield was traveling by train from Hollywood, Florida to Boston, Massachusetts via New York's Penn Station. Agent O'Neill stated that Agent Small forwarded to him Government's Exhibit 1, which is a printout of the reservation made for the Defendant from the email address of barbaryinc@yahoo.com.

Agent O'Neill testified that the reservation was suspicious because Hollywood, Florida is a source area for oxycodone and cocaine; the one-way ticket cost $221.00 and was purchased within 48 hours of travel by a third party with multiple telephone numbers, and the train trip took 33 hours (as opposed to a much shorter and cheaper plane trip). Upon receiving the printout, Agent O'Neill attempted to determine who Hartfield was. He ran the Defendant's name and address through various databases and learned that there was an outstanding warrant for the Defendant's arrest on a crack cocaine charge from South Carolina. DEA databases also revealed that the Defendant was a person of interest to DEA in South Florida.

Agent O'Neill identified Government's Exhibit 2 as a printout of the South Carolina arrest warrant, which reflects the Defendant's date of birth, social security number and driver's license number. The printout also indicates that the warrant remained active and that South Carolina would extradite. Agent O'Neill stated that he next obtained a copy of the Defendant's driver's license (Government's Exhibit 7), which reflects the same license number as that listed on the South Carolina warrant.

Based on this information, Agent O'Neill and other law enforcement agents set up surveillance at South Station, where they waited for the Defendant's train. There were a total of six

officers at the station: one waited with Agent O'Neill, and the other four looked for anyone who might be meeting the Defendant. After the train arrived, Agent O'Neill located the Defendant, identified himself, and asked the Defendant to identify himself. At that time, the agent and his fellow officers were in plain clothes and no guns were drawn. Agent O'Neill asked the Defendant to produce some ID, and the Defendant complied. The agent ascertained that the Defendant's ID matched that listed on the South Carolina warrant.

Agent O'Neill advised the Defendant that he was under arrest based on a warrant from South Carolina, and read to the Defendant all of the required Miranda warnings, as listed on a DEA Form 13A card, which the agent carried with him. (Government's Exhibit 3) The Defendant acknowledged that he understood his rights and agreed to answer questions. Agent O'Neill asked the Defendant if he was carrying contraband or illegal drugs, and the Defendant responded that he had something. The Defendant told Agent O'Neill that he wanted to cooperate, and the agent led the Defendant away from the railroad platform and into a lounge where they could speak more privately.

Agent O'Neill testified that he asked the Defendant for permission to search the bag he was carrying, and the Defendant agreed. Agent O'Neill noted that the bag would have been searched even without the Defendant's consent, as a search incident to arrest and for inventory purposes. However, he asked for consent as a gesture of goodwill because the Defendant had agreed to cooperate. A search of the Defendant's bag revealed 9,360 pills, weighing 1300 grams, which later tested positive for oxycodone.

When Agent O'Neill asked the Defendant where the pills had come from and where they were going, the Defendant replied that he had gotten them from Andre Barbary, whom the Defendant was supposed to call when he arrived. The Defendant had a reservation at the Doubletree Hotel on Soldier's Field Road, which Agent O'Neill confirmed. The Defendant stated that Barbary was to contact a black male known to the Defendant as "Clean Cut," who would pick up the pills at the hotel and give the Defendant money from the previous delivery. The Defendant added that he

had done this on four prior occasions, bringing back between $30,000 and $50,000.  He gave the agents a full description of "Clean Cut" and agreed to attempt a controlled delivery.

Agent O'Neill related that he took the Defendant to the hotel, where the Defendant checked in.  By that time, the Defendant already had contacted Barbary, who had paid for the room in advance.  The Defendant's call to Barbary was not recorded because Massachusetts requires the consent of both parties to a conversation before it can be taped.  "Clean Cut" never arrived at the hotel, and the operation was called off at around midnight.  At that time, the Defendant was charged with possession of oxycodone and South Carolina was notified that the Defendant had been arrested on the warrant from that State.  (Government's Exhibit 4)

Agent O'Neill identified Government's Exhibit 5 as a certified copy of the South Carolina warrant, which matched the printout the agent had received (Government's Exhibit 3).  The agent added that the date of birth and social security number on Exhibit 5 matched the ID the Defendant provided at the time of his arrest.  Agent O'Neill also identified Government's Exhibit 6 as a copy of the Massachusetts indictment against the Defendant for possession of oxycodone with intent to distribute.

Agent O'Neill stated that during his encounter with the Defendant on the railroad platform the Defendant never seemed confused, and the agent had no trouble understanding him.  He described the Defendant as cooperative and a gentleman at all times, and stated that there were no guns pointed at the Defendant at any time.

On cross examination, Agent O'Neill testified that the Defendant did not ask any questions of him.  The agent stated that he read the Defendant his rights immediately, then moved away from the platform to search the Defendant's bag.  Agent O'Neill conceded that he did not ask the Defendant to sign a written Miranda waiver form or consent to search form.

## II. DISCUSSION

### A. Initial Stop

In his motion, the Defendant first argues that the initial stop of the Defendant was unlawful because there was no reasonable suspicion sufficient to detain him, and that the arrest warrant from South Carolina was not viable because South Carolina would not extradite him. The motion recites that the Defendant had been arrested in Florida on several occasions after the warrant was issued, and no action had been taken on it.

This argument is refuted by the credible testimony of Agent O'Neill, who identified the printout he received of the South Carolina warrant. The printout indicated that the warrant remained viable and that South Carolina authorities were prepared to extradite. The warrant also contained the Defendant's date of birth and driver's license number. Agent O'Neill obtained a copy of the Defendant's Florida driver's license, which contained the same date of birth and license number. When the agent located the Defendant, he asked him for identification, which the Defendant produced. The ID matched the information already in Agent O'Neill's possession. At that point, the Defendant was placed under arrest on the South Carolina warrant.

The law is clear that a defendant may be arrested on an outstanding warrant from another state, and evidence seized pursuant to the arrest is admissible. United States v. D'Angelo, 819 F.2d 1062, 1064 (11th Cir. 1987). An arrest is made pursuant to a valid warrant is lawful even if the officers are hoping to find evidence of another offense. United States v. Jones, 377 F.3d 1313, 1314 (11th Cir. 2004). Moreover, the evidence is admissible even if the state which issued the warrant decides not to prosecute the defendant. United States v. Moore, 477 F.2d 538, 539 (5th Cir. 1973). Accordingly, there is no basis to suppress any evidence seized from the Defendant in this case on the ground of an invalid stop and/or arrest.

### B. Statements

The Defendant next argues that he was not advised of his Miranda rights prior to questioning. Once again, the Defendant's claim is belied by the credible testimony of Agent O'Neill,

5

who stated that he read the Miranda warnings from a card immediately following the Defendant's arrest on the South Carolina warrant, while he and the Defendant were still on the railroad platform. Agent O'Neill also testified that he was accompanied by only one other agent; that they were in plain clothes and no weapons were drawn; that the Defendant did not seem confused and the agent had no trouble understanding him, and the Defendant was fully cooperative from the outset.

In determining whether the Defendant's statement was voluntary, this Court must ascertain whether he made a free and deliberate choice to waive the right to remain silent, and whether he was aware of both the nature of the right he was abandoning and the consequences of his decision to abandon it. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). Here, under the totality of the circumstances as described by Agent O'Neill, the undersigned finds that the Defendant made a free and deliberate choice to waive his rights, and that he understood those rights and the consequences of waiving them. Accordingly, the Defendant's statements were voluntary and they are admissible against him at trial.

**C. Search of the Bag**

Finally, the Defendant contends that the Government did not obtain a valid consent to search his luggage. The parties agree that the Government must prove that under the totality of the circumstances, the Defendant's consent was given voluntarily. Florida v. Royer, 460 U.S. 491 (1983); United States v. Tovar-Ricor, 61 F.3d 1529 (11th Cir. 2011).

Agent O'Neill's uncontradicted testimony was that the Defendant was polite and cooperative from the outset, and that he freely gave consent to search his luggage after they had moved from the railroad platform to a more private location. Given the Defendant's willingness to cooperate by admitting his involvement in the offense and participating in a controlled delivery, the

undersigned finds Agent O'Neill's testimony to be fully credible. Moreover, as the agent pointed out, the Defendant had been placed under arrest and his luggage would have been searched as a matter of course, regardless of consent, incident to the arrest and as part of the inventory process. Therefore, the evidence recovered from the Defendant's bag is admissible both as the product of a valid consent and pursuant to the inevitable discovery doctrine. Jefferson v. Fountain, 482 F.3d 1286, 1296 (11th Cir. 2004).

Accordingly, the Defendant cannot prevail on any of the asserted grounds, and none of the evidence obtained from him on September 24, 2010, should be suppressed.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that Defendant **Willie J. Hartfield's** Motion to Suppress Physical Evidence and Confessions, Admissions or Statements (DE 223) be DENIED.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Robin S. Rosenbaum, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 6th day of September, 2012.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record